**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**PATRICIA ANDERSON,**

    **Plaintiff,**

                                                                                   **Civil Action 2:09-cv-00474**
**vs.**                                                      **Judge John D. Holschuh**
                                                          **Magistrate Judge E. A. Preston Deavers**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**REPORT AND RECOMMENDATION**

**I.    INTRODUCTION**

Plaintiff, Patricia Anderson, brings this action under 42 U.S.C. § 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Magistrate Judge for a report and recommendation on Plaintiff's Statement of Errors (Doc. 12) and the Commissioner's Memorandum in Opposition (Doc. 14).

Plaintiff Anderson maintains that she became disabled on January 1, 2004, because of a psychotic disorder, carpal tunnel, heel spurs, post traumatic stress, hypertension, allergies, and back problems.[1] On December 15, 2005, Plaintiff filed her application for disability insurance

---

[1] At the administrative hearing, Plaintiff amended her alleged disability onset date to October 25, 2005.

benefits.  The application was denied initially and again upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

On September 9, 2008, Administrative Law Judge Rita S. Eppler ("ALJ") held a hearing at which Plaintiff, represented by counsel, appeared and testified.  A vocational expert and medical expert also testified.  On November 3, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. at 14–28.)  The ALJ determined that Plaintiff remained able to perform a range of light work that included a significant number of jobs.  (*Id.*)  On April 16, 2009, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 4–6.)

Plaintiff then timely commenced this civil action.

## II.   PLAINTIFF'S PERSONAL AND VOCATIONAL BACKGROUND

Plaintiff was born November 1, 1960.  (R. at 59.)  She completed high school and has worked as a pizza deliverer.  (R. at 77, 158.)  Plaintiff testified that she has lived in a mobile home with her mother for the past fifteen years.  (R. at 442.)

Plaintiff reported to the agency and testified that she cleaned house, did the dishes, cooked, did the laundry, ironed, and mopped and vacuumed the floor (R. 130–31, 159-60, 454.)  She also reported that she took care of her mother, drove, ran errands, filled out paperwork, took her mother to doctors' appointments, shopped for food, bathed and fed the pets, mowed, used a weed whacker, read, rode a bicycle in the summer, and built fires with her boyfriend.  (R. 130, 132–33, 159–60, 442–43, 454–55).  Plaintiff reported that she could lift or carry 20 pounds (Tr. 159).

She also testified that she has scoliosis of her spine, and that consequently, she is limited

in how long she can stand and walk.  (R. at 447.)  She testified that drove herself to the hearing without requiring any stops, which took one and one-half hours.  (R. at 443.)  Further, she testified that although she can use her hands for doing things like buttoning buttons and opening jars, she has problems when she tries to use her weed whacker.  (R. at 448–49.)

Finally, Plaintiff testified that, although she had a prior history of such events, her auditory hallucinations were under control and had been for approximately a year.  (R. at 456.)

### III. MEDICAL RECORDS

In July and August 2005, Plaintiff reported mid-back pain to chiropractor James C. Gray, D.C.  (R. at 235.)  Plaintiff reported tenderness upon palpatation.  (R. at 236.)

On October 25, 2005, Plaintiff was involuntarily admitted to the Appalachian Behavior Healthcare – Athens Campus ("ABH"), after she called the fire department to report a bomb in her home that she believed was placed there by Osama bin Laden.  (R. at 203, 212.)  Plaintiff's mother reported that Plaintiff's symptoms began abruptly after Plaintiff began taking pills she ordered out of a catalog, which she believed were for weight control.  (R. at 212, 215.)  Plaintiff's boyfriend also reported that Plaintiff had been taking over-the-counter medication, which he believed to be called "speedball" for weightloss.  (R. at 203, 215.)  Plaintiff was hospitalized until November 2, 2005.  (R. at 210, 220.)

On October 26, 2005, during her stay at ABH, Dr. Anthony Derrico, D.O., conducted a comprehensive psychiatric examination of Plaintiff.  (R. at 216–19.)  Plaintiff denied suicidal ideations.  (R. at 216.)   Plaintiff's speech was clear, but her mood was frightened and her affect was anxious and fearful.  (R. at 217.)  Dr. Derrico reported that Plaintiff's thought process was highly disorganized and that she had looseness of associations.  (*Id.*)  He noted that she was

delusional and paranoid. (*Id.*) Dr. Derrico reported that Plaintiff had auditory hallucinations, no insight, and her judgment was poor. (R. at 218.) He further reported that Plaintiff took over-the-counter diet pills and opined that this may have led to an exacerbation of psychosis. (*Id.*)

On October 28, 2005, another ABH physician examined Plaintiff. (R. at 210–11.) Plaintiff was cooperative, alert, and oriented. (R. at 210.) Plaintiff demonstrated good motion in her back and extremities, and good strength in her extremities. (*Id.*) The physician did not report any motor, sensory, or reflex abnormalities. (*Id.*) In her November 3, 2005, discharge summary, Dr. Derrico reported that Plaintiff cooperated with the mental treatment, used the medications she was given, and that those medications quickly resolved her abrupt onset of psychosis. (R. at 222.) He further reported that once Plaintiff was on medication, she was pleasant and polite, she denied depression, and she had no auditory hallucinations or delusions. (R. at 223.) Dr. Derrico described Plaintiff's mood as euthymic (good) and her affect as pleasant. (*Id.*) Plaintiff denied suicidal or homicidal ideations. (*Id.*) Upon her release, Dr. Derrico prescribed medications, referred Plaintiff to Tri-County Mental Health and Counseling, and instructed Plaintiff not to take over-the-counter pills for weight control. (*Id.*)

On November 3, 2005, Plaintiff saw Dr. Ramanathan for an initial psychiatric evaluation. (R. at 334.) Plaintiff reported that she had her first psychotic break following ingestion of medication. (R. at 336.) Dr. Ramanathan described Plaintiff as alert and oriented. She noted that Plaintiff spoke at an increased rate, and her mood was euthymic with a congruent affect. (*Id.*) She further noted that Plaintiff had no suicidal or homicidal ideations. (*Id.*) Dr. Ramanathan diagosed Plaintiff with psychotic disorder (not otherwise specified) and did not rule

out bipolar disorder with psychotic features. (R. at 337.) She provided Plaintiff with samples of anti-psychotic medication and noted that she needed further information for clarification of a diagnosis. (*Id.*)

On December 7, 2005, Plaintiff was taken to the Hocking Valley Community Hospital Emergency Room, with complaints of suicidal ideation. (R. at 225.) Dr. Robert A. Sivier, M.D., noted that Plaintiff had thought about suicide, but had never made an attempt. (*Id.*) He also noted that Plaintiff had been taking only one-half dose of her Zyprexa, a psychotropic medicine, because she was running low and could not afford to purchase more. (*Id.*) Dr. Sivier's examination of Plaintiff demonstrated that Plaintiff moved all extremities without any problem. (*Id.*) He reported that Plaintiff was pacing the emergency room without difficulty, and although she appeared anxious, she was not disruptive. (R. at 226–27.) Plaintiff was transferred to respite and advised to take her medications. (R. at 227.)

On December 16, 2005, Plaintiff saw Dr. Ramanathan for a pharmacological management appointment. (R. at 331.) Plaintiff reported that she had auditory hallucinations and felt depressed. (R. at 331.) Dr. Ramanathan noted that Plaintiff was alert and oriented, was pacing back in forth, spoke at a normal rate and volume, and her mood was anxious with a congruent affect. (*Id.*) She further reported that Plaintiff had no suicidal or homicidal ideations. (*Id.*) Dr. Ramanathan increased Plaintiff's medications. (R. at 331.)

Dr. Ramanathan saw Plaintiff from December 2005 though August 2007. (R. at 300–30.) During that period of time, Plaintiff's mood ranged from good and not depressed to depressed, she was alert and oriented, and her speech ranged from rapid to normal rate and volume. (*Id.*) Her affect was congruent with her mood, her cognition was clear, her thought processes were

logical and coherent, and her insight and judgment were fair.  (*Id.*)  Plaintiff reported that she feels anxious when she thinks about social security.  (R. at 313, 326.)

In April 2006, Dr. Ramanathan assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55–60.[2]  (R. at 327.)  She reported numerous times that Plaintiff was doing well on her medications, she had a major improvement in her psychotic symptoms, and she was stable on her medications.  (R. at 309, 311, 321, 324, 327–28, 330.)

During two of her visits with Dr. Ramanathan, Plaintiff reported foot pain.  (R. at 265, 266.)  During several examinations, Plaintiff reported that she had auditory hallucinations, but she had no visual hallucinations, no delusions, no suicidal ideations, and no homicidal ideations.  (*Id.*)  On September 15, 2006, Plaintiff reported that she began having auditory hallucinations after her cat passed away four days earlier, on September 11, 2006.  (R. at 317.) On December 15, 2006, Plaintiff reported that she had been having auditory hallucinations for two days.  (R. at 313.)  On January 12, 2007, Plaintiff reported continued auditory hallucinations, but that they were not as intense or frequent.  (R. at 311.)  On March 23, 2007, Plaintiff reported that she had been having auditory hallucinations for about two weeks and that the sounds were getting stronger gradually.  (R. at 306.)  On April 27, 2007, Plaintiff reported that the auditory hallucinations had decreased significantly.  (R. at 305.)

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A GAF score of 55 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

On May 25, 2006, after review of Plaintiff's medical record, Dr. Vicki Casterline, a state agency psychologist, assessed Plaintiff's mental condition. (R. at 166–83.) Dr. Casterline found that Plaintiff was moderately limited in her ability to interact appropriately with the general public; get along with co-workers or peers; and respond appropriately to changes in the workplace. She further found that Plaintiff had moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation. (R. at 180.) Dr. Casterline found that Plaintiff could understand, remember and follow simple one- and two-step instructions for routine repetitive tasks. (R. at 168.)

Dr. Prakash Kudlapur saw Plaintiff from January 2006 to October 2006. (R. at 253–65.) Dr. Kudlapur reported that Plaintiff's depression was stable or better, she was always oriented, and her mood was "OK." (*Id*.) Dr. Kudlapur saw Plaintiff again from November 2007 through May 2008. (R. at 358–63.) Plaintiff's bipolar condition was stable (R. at 358), her gait was normal (R. at 363), and in March 2008, Plaintiff reported doing spring cleaning (R. at 359). She reported that she had back pain when doing spring cleaning. (R. at 359.)

On January 10, 2007, Plaintiff presented to Dr. Melitta Simmons, D.P.M., a podiatrist, with complaints of bilateral midfoot pain. (R. at 299.) Upon examination, Dr. Simmons noted normal sensation, reflexes, and strength in Plaintiff's feet. (*Id*.) She diagnosed pes planovalgus deformity, posterior tibial tendon dysfunction, and midfoot arthritis. (*Id*.) Dr. Simmons constructed inserts and instructed Plaintiff to consider custom orthotics. (*Id*.) On February 21, 2007, Dr. Simmons saw Plaintiff to check her orthotics. (R. at 298.) Plaintiff could do a bilateral heel raise, but could not do a single heel raise. (*Id*.) Plaintiff's inserts were modified,

and the arch was increased. (*Id*.) On December 4, 2007, Dr. Simmons saw Plaintiff again for follow-up. (R. at 351.) Dr. Simmons noted objective findings of signs and symptoms consistent with bilateral fasciitis/Achilles tendonitis. (R. at 351.) Her December 18, 2007, and January 29, 2008, examination findings were the same. (*Id*.) On February 28, 2008, Plaintiff reported pain in both feet, and x-rays showed spurring. (*Id*.) On May 15, 2008, Plaintiff underwent right foot surgery. (R. at 354.) On May 22, 2008, Plaintiff stated her right heel felt good and she wanted to proceed with left foot surgery. (R. at 350.) In June 2008, Plaintiff's right heel felt "really good." (*Id*.) On July 3, 2008, Plaintiff underwent left foot surgery. (R. at 352.) On July 17, 2008, Dr. Simmons saw Plaintiff for follow-up after her left foot surgery. (R. at 349.) Plaintiff reported that she was doing well. (*Id*.) Dr. Simmons noted that the surgical site was healing well and that Plaintiff's progress was good. (R. at 349.)

On December 17, 2007, Plaintiff presented to Tri-County Mental Health and Counseling with suicidal ideation. (R. at 417.) Plaintiff reported that although she had suicidal thoughts, she would not follow through. (*Id*.)

On December 20, 2007, Plaintiff presented to Dr. Kevin A. Hollingsworth with complaints of bilateral anterior knee pain. (R. at 390.) Dr. Hollingsworth diagnosed Plaintiff with bilateral patellar chondromalacia (abnormal softening of the cartilage of the under the kneecap). (*Id*.) He gave Plaintiff a cortisone injection. (*Id*.) On January 24, 2008, Plaintiff underwent MRI of both knees. (R. at 385–88.) The MRI that showed that Plaintiff's right knee had moderate patellar chondromalacia, minimal effusion, a mild cyst, and subluxation (knee cap dislocation); and her left knee had patellar subluxation or was fairly unremarkable. (R. at 382, 385–88.) Plaintiff underwent arthroscopic right knee surgery on January 30, 2008. (R. at

380–81.)  Plaintiff reported that everything went fine.  (R. at 411.)

On January 15, 2008, Dr. Ramanathan noted that Plaintiff denied psychotic symptoms, but reported a depressed mood.  (R. at 414.)

On February 19, 2008, Plaintiff had a follow-up examination with Dr. Hollingsworth.  (R. at 379.)  Dr. Hollingsworth reported that Plaintiff's right knee motion was normal and that Plaintiff was doing well.  (*Id.*)  Plaintiff reported bilateral hand pain and numbness.  (R. at 379.)  Dr. Hollingsworth diagnosed bilateral carpal tunnel syndrome, and he noted that Plaintiff wanted to proceed with bilateral upper extremity EMG.  (*Id.*)

On March 3, 2008, Dr. Ramanathan noted that Plaintiff appeared to be relieved about her foot and carpal tunnel surgeries rather than anxious.  (R. at 408.)  She further noted that Plaintiff exhibited no symptoms of psychosis and that her depression had decreased.  (*Id.*)  Dr. Ramanathan also noted that Plaintiff was alert and oriented, her speech was normal, and she had no hallucinations, or suicidal or homicidal ideations.  (R. at 409.)

On March 11, 2008, an EMG and nerve conduction studies of Plaintiff's upper extremities was performed.  (R. at 377–78.)  Dr. Benedict Woo, M.D., interpreted the results, and indicated that the results showed mild carpal tunnel syndrome.  (R. at 378.)  Upon examination of Plaintiff, Dr. Woo reported that she had full strength of the upper extremities, no atrophy, and normal reflexes and sensation.  (R. at 377.)  He noted that "[g]iven the mildness of the findings, [Plaintiff] may benefit from a trial of conservative management . . . ."  (R. at 378.)  On April 11, 2008, Plaintiff underwent decompression of the left carpal tunnel.  (R. at 373.)  On April 24, 2008, Dr. Hollingsworth examined Plaintiff and noted that her condition had significantly improved.  (R. at 372.)

On April 15, 2008, Plaintiff saw Dr. Ramanathan again.  (R. at 404.)  Plaintiff reported feeling anxious about the surgery and depressed, but that she is now feeling better.  (*Id.*)  Dr. Ramanathan noted that Plaintiff had some suicidal ideation.  (R. at 403.)  She further noted that Plaintiff appeard to have reactive depression because she was worried about her upcoming foot surgeries.  (R. at 404.)

On March 31, 2008, Margaret A. Miller, a physical therapist, reported Plaintiff walked with a normal gait, was not in any acute distress, was pleasant and cooperative, and was alert and oriented.  (R. at 431–33.)  She further noted that's Plaintiff's extremity motion was normal, her thoracic motion was reduced, and her strength in her extremities was normal.  (*Id.*)

On June 16, 2008, Dr. Ramanathan found that Plaintiff was depressed, but had no psychotic symptoms.  (R. at 399–400.)

On August 5, 2008, Plaintiff told Dr. Ramanathan that she had been doing well with her surgeries.  (R. at 396.)  Plaintiff reported that she was feeling depressed because of her weight.  (*Id.*)

## IV.   MEDICAL EXPERT TESTIMONY

Medical Expert Dr. J. Nusbaum, who is a board certified surgeon, testified at the final administrative hearing.  (R. 456–57).  Dr. Nusbaum testified that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; sit 2 hours at a time for a total of 6 hours; stand and/or walk one hour at a time for a total of 6 hours; occasionally stoop, crouch, and squat; climb ladders rarely; and not use her lower extremities to operate foot controls.  (R. at 459.)

## V.   VOCATIONAL EXPERT TESTIMONY

The Vocational Expert ("VE"), William J. Kiger, testified at the administrative hearing.

(R. at 460.)  The ALJ asked the VE a hypothetical question regarding what jobs an individual like Plaintiff could perform, assuming she could lift 20 pounds occasionally and 10 pounds frequently; sit 2 hours at a time for a total of 6 hours; stand and/or walk one hour at a time for a total of 6 hours; occasionally stoop, crouch, and squat; climb ladders rarely; not use her lower extremities to operate foot controls; and understand, remember and follow one and two step instructions for routine, simple and repetitive tasks, that were low stress including not having production quotas or time pressures.  (R. at 462, 464.)  The VE testified that such a person would be precluded from performing Plaintiff's past work as a pizza deliverer due to the foot control restriction.  (R. at 462.)  He further testified that such a person could perform about 6,300 jobs in central Ohio as a packer, machine operator, laundry folder, and machine feeder.  (R. 461, 463–65).

Upon questioning by Plaintiff's counsel, the VE testified that such an individual, with added hand limitations, such that the individual would only occasionally be able to handle and finger, would be precluded from employment of sedentary and light, unskilled work due to the degree of dexterity, handling, and grasping required.  (R. at 466.)  In addition, the VE testified that such an individual would not be employable if, because of psychological reasons, that person would be off task fifteen percent of the workday.  (*Id*.)

## VI.   THE ADMINISTRATIVE DECISION

On November 3, 2008, the ALJ issued her decision.  (R. at 28.)  The ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, degenerative joint disease of both knees and feet, bilateral carpal tunnel syndrome, obesity, hypertension, rule out bipolar disorder with psychotic features, and a major

-11-

depressive disorder. (R. at 19.) The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19–21.)

The ALJ then considered Plaintiff's residual functional capacity ("RFC"). (R. at 22–27.) In determining Plaintiff's RFC, the ALJ found Plaintiff's complaints not fully credible. (R. at 22–25.) The ALJ determined that Plaintiff was unable to perform her past relevant work, but she retained the RFC to do a range of light work. (R. 22, 27). The ALJ used the Medical-Vocational Guidelines (grid), together with the testimony of the VE, to conclude that Plaintiff was not disabled because there was a significant number of jobs that she could perform. (R. at 25–28.) This decision represents the final decision of the Commissioner.

## VII. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.' " *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

" 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.' " *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, " 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII.  ANALYSIS

In her Statement of Errors, Plaintiff raises a three issues. First, Plaintiff asserts that the ALJ erred in finding Plaintiff's testimony not credible. Second, Plaintiff contends that the ALJ failed to evaluate Plaintiff's pain as a disabling condition. Finally, Plaintiff asserts that the ALJ erred by failing to obtain a medical consultative examiner, or in the alternative, by failing to have a psychiatric medical expert present at the hearing.

For the reasons that follow, the undersigned finds that the ALJ's failure to properly evaluate Plaintiff's credibility with regards to her allegations of depression and suicidal ideation constitutes reversible error.[3]

---

[3]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 Fed. Appx. 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Sullenger v. Comm'r of Soc. Sec.*, 255 Fed.Appx. 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  In addition, the ALJ's credibility assessment must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted);  "The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record."

In the instant case, the ALJ failed to consider the entire case record with regard to her evaluation of Plaintiff's allegations of depression and suicidal ideation.  The ALJ concluded that Plaintiff's testimony was "not fully credible."  (R. at 25.)  She indicated that the "lack of support for [Plaintiff's] subjective complaints and functional limitations is not due to any unexplained mental impairment but to [Plaintiff's] exaggeration of complaints."  (*Id*.)  In rejecting Plaintiff's allegations of her mental limitations, the ALJ stated:

> With regard to the claimant's allegations of depression and suicidal ideation, the objective evidence of the record establishes that the claimant has not experienced any hallucinatory ideation since her psychiatric inpatient hospitalization in October 2005 . . . , nor has she experienced any suicidal ideation since December 2005 . . . .

(R. at 24.)  A review of the record reveals, however that the ALJ was mistaken in this regard.

-14-

Contrary to the ALJ's assertion that Plaintiff did not experience auditory hallucinations after October 2005, Plaintiff reported auditory hallucinations to Dr. Ramanathan on September, 15, 2006; December 15, 2006; January 12, 2007; March 23, 2007; and April 27, 2007.  (R. at 305, 306, 311, 313, 317.)  Further, contrary to the ALJ's assertion that Plaintiff had not experienced suicidal ideation since December 2005, Dr. Ramanathan's notes reflect that Plaintiff experienced suicidal ideation in December 2007 and again in April 2008.  (R. at 403, 417.)  Thus, it appears the ALJ did not consider the entire record when evaluating Plaintiff's credibility as it related to her allegations of depression and suicidal ideation.  Because "the ALJ, and not the reviewing court, [must] evaluate the credibility . . . of the claimant" *Rogers*, 486 F.3d. at 247, remand is appropriate.

### IX.  CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  Accordingly, the undersigned **RECOMMENDS** that Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

### X.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

July 30, 2010                                             /s/ *Elizabeth A. Preston Deavers*
                                                                     Elizabeth A. Preston Deavers
                                                                     United States Magistrate Judge